FILED
2013 SEP 10 AM 4: 13
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY:_____

PATRICIA A. KINAGA, SBN 126845
DREW L. ALEXIS, SBN 177672
DANIEL HO, SBN 205852
WOO JEAN CHUNG, SBN 266838
KINAGA LAW FIRM
617 South Olive Street, Suite 1210
Los Angeles, CA 90014
Tel: 213.623.8588
Fax: 213.623.8788
pkinaga@kinagalawfirm.com
dalexis@kinagalawfirm.com
dho@kinagalawfirm.com
jchung@kinagalawfirm.com

Attorneys for Plaintiff
NICHOLAS LYON

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

NICHOLAS LYON, an individual,

   Plaintiff,

v.

FUNIMATION PRODUCTIONS, LTD., dba FUNIMATION ENTERTAINMENT; AMERICAN UNITED MEDIA, LLC, dba IFA DISTRIBUTION; ROBERT RODRIGUEZ, as an individual; GEN FUKUNAGA, as an individual; GIANT APE MEDIA; BULLET FILM PRODUCTION COMPANY, L.L.C., and DOES 1 through 50,

   Defendants.

CASE NO. SACV 13-1322 MWF (AJWx)

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

1. Copyright Infringement (17 U.S.C. section 501 et seq.)

2. Breach of Contract

3. Breach of Covenant of Good Faith and Fair Dealing

4. Promissory Fraud [False Promises]

5. Intentional Interference with Contractual Relations

6. Unfair Competition (Calif. Bus. & Prof. Code Section 17200 et seq.)

7. Common Law Unfair Competition

Plaintiff, Nicholas Lyon ("Plaintiff"), alleges as follows:

1

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

## FEDERAL QUESTION JURISDICTION

1. This action asserts a claim for copyright infringement under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* (the "Copyright Act"). This Court has exclusive jurisdiction over this action under the Copyright Act. 28 U.S.C. section 1338 (a)

## PERSONAL JURISDICTION

2. Defendant American United Media, LLC (AUM) was at relevant times doing business at 7119 Sunset Blvd., Suite 403, Los Angeles, CA. 90046. AUM is also doing business in Los Angeles County under the name IFA Distribution, whose address is 10250 Constellation Blvd. 2900, Los Angeles, CA 90067.

3. Plaintiff, Defendant AUM, and SC Films International (hereinafter "SC Films") entered into and executed in Los Angeles County an agreement entitled "Confidential Bullet Term Sheet" (hereinafter referred to as "Original Agreement") for the production of a film to be entitled "Bullet" (hereinafter "Motion Picture").

4. Defendant Robert Rodriguez is a resident of California, and signed the Original Agreement on behalf of AUM.

5. Plaintiff is a resident of Los Angeles County, California.

6. Matthew Joynes, the chair and a founder and shareholder of SC Films and a major witness to the factual allegations set forth herein, is a resident of Los Angeles County, California.

7. SC Films is headquartered in Los Angeles County, California.

8. Defendant FUNimation Entertainment (hereinafter "FUNimation") is a fictitious name for FUNimation Productions, Ltd., a Texas limited partnership. FUNimation is a national film and television company which distributes productions in North America, and has substantial contacts with California given that many of its productions, including the Motion Picture, are made in California. After entering into a contract with AUM concerning the Motion Picture, FUNimation met in Los Angeles, and other locations in California (including Lancaster) to, inter alia, visit the production set, attend meetings, including with the director, editor and other

personnel working on the Motion Picture, and to view daily footage of the Motion Picture, and has been in California to advertise the Motion Picture.

9. Defendant Gen Fukunaga is President of FUNimation which has substantial contacts in California as described in Paragraph 8, infra; as a Managing Partner of AUM, which is doing business in California as described in paragraph 1, infra; and is Managing Director of IFA Distribution, a company located at 10250 Constellation Boulevard, Los Angeles, CA 90067.

10. Defendant Giant Ape Media is FUNimation's film division which is currently advertising the Motion Picture in California.

11. Defendant Bullet Film Production Company, L.L.C. ("BFPC") is a Texas limited liability company that was formed by Defendant FUNimation, Defendant AUM and SC Films.

## VENUE

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

13. The Original Agreement was entered into in Los Angeles County, the filming took place in Los Angeles County, AUM has conspired with FUNimation and Giant Ape Media to commit acts in violation of the Original Agreement, FUNimation has substantial contacts in Los Angeles County as described in paragraph 8 infra, FUNimation and Giant Ape Media have marketed the Motion Picture in Los Angeles County, AUM is doing business in Los Angeles County, and defendant Robert Rodriguez resides in this District. Moreover, BFPC was formed to engage in business activities in Los Angeles County, California in connection with the production of the Motion Picture.

## THE PARTIES

14. Plaintiff Nicholas Lyon is a film writer, director and producer.

15. Defendant American United Media, LLC, is a limited liability company which produces top-tier feature films and television projects throughout the world.

16. Defendant FUNimation is a film and television company known mainly for its distribution of Japanese anime productions.

17. Defendant Robert Rodriguez is the President of AUM.

18. FUNimation President Defendant Gen Fukunaga is also the Managing Partner of Defendant AUM.

19. Defendant Giant Ape Media is a distributor that markets live action/independent films, including the Motion Picture.

20. Defendant BFPC was formed to develop and produce for sale or assignment to a distributor and/or to otherwise exploit the Motion Picture and ancillary rights to the Motion Picture and to engage in other commercial activities reasonably related thereto.

21. The true names and capacities of defendants named herein as Does 1 though 10, inclusive are unknown to Plaintiff, and therefore Plaintiff sues these defendants by such fictitious names. Plaintiff will seek leave of Court to amend this Complaint to show their true names and capacities when the same have been ascertained. Plaintiff is informed and believes and on that basis alleges that Does 1 through 10, inclusive, were responsible for the acts and transactions alleged herein and are liable to Plaintiff.

22. This Court has personal jurisdiction over Defendants in that Defendants conducted, and continue to conduct, business in this District, Defendants intentionally direct activities to this District, and the infringing acts, conduct and omissions alleged in this Complaint occurred in this District.

## FACTS COMMON TO ALL COUNTS

23. This dispute concerns the production and ownership of a motion picture entitled "Bullet" (the "Motion Picture"). The Motion Picture will star actor Danny Trejo, known for his roles in gritty films including "Machete" and television appearances in series such as "Breaking Bad".

24. Plaintiff entered into the Original Agreement on or about September 2, 2012, for the purpose of "developing, producing, completing and delivering the motion picture presently entitled "Bullet" based on a script written by Plaintiff, and for which he submitted to the Copyright Office on December 20, 2012 for copyright registration.

25. By the Original Agreement, all the parties—which was defined to consist of Plaintiff Lyon, SC Films and AUM—agreed to create a special purpose vehicle entity to hold and manage the rights, produce, and own the Motion Picture.

26. By the Original Agreement, SC Films and AUM were to contribute a minimum of $250,000 each of equity for production of the Motion Picture.

27. By the Original Agreement, Plaintiff was to be the director and provide the script, and was further referred to in the Original Agreement as "Producer".

28. By the Original Agreement, Plaintiff was to receive "A NICK LYON FILM" credit on all posters, DVD covers and advertisements for the Motion Picture.

29. By the Original Agreement, Plaintiff was to receive 30% of net receipts, defined as adjusted gross receipts; AUM and SC Films were to each receive 35% of net receipts.

30. By the Original Agreement, each party promised to fulfill its obligations and exercise its rights in a manner that would reflect favorably at all times on the good name, goodwill, and reputation of all the parties to the Original Agreement.

31. By the Original Agreement, all the parties were required to exchange and approve "all relevant fully executed agreements by all parties".

32. By the Original Agreement, all parties promised to avoid "deceptive, misleading, or unethical practices", and to comply with all applicable laws and regulations.

33. Without notice to, or knowledge by Plaintiff, just two days after execution of the Original Agreement, Defendants AUM and FUNimation executed an agreement entitled "Deal Memo" (hereinafter "AUM/FUNimation Agreement") whereby AUM purportedly agreed to "produce and deliver" the Motion Picture.

34. The AUM/FUNimation Agreement makes absolutely no reference to Plaintiff, including his role, as set forth under the Original Agreement, as director or producer of the Motion Picture and instead purports to grant FUNimation "full approval rights over all aspects of the production, including the script, the primary cast, director and key creative [sic] as well as business and creative control of the Property", and purports to grant FUNimation 50% equity in the Motion Picture.

35. The AUM/FUNimation Agreement was signed by Gen Fukunaga as "President of FUNimation" while Gen Fukunaga was also Managing Partner of AUM.

36. Defendant Robert Rodriguez signed the AUM/FUNimation Agreement on behalf of AUM.

37. On January 8, 2013, Plaintiff signed an agreement which purported to assign his copyright and intellectual property rights ("Assignment of Copyright and Intellectual Property Rights") to a newly created company, BFPC, unaware that BFPC had been or was to be created without referencing him in any respect, e.g., as director, writer, owner, or acknowledging any of the rights vested in Plaintiff pursuant to the Original Agreement.

38. On January 10, 2013, Plaintiff also signed an agreement that purported to sell his literary rights to his script to BFPC for $20,000 ("Agreement to Sell Literary Rights").

39. BFPC had been formed without prior notice to or knowledge of Plaintiff; as set forth in the BFPC's Operating Agreement, dated January 15, 2013, the purpose of BFPC is:

> "[T]o develop and produce for Sale or assignment to a Distributor and/or to otherwise exploit the Motion Picture ["Bullet"] and ancillary rights to the Motion Picture and engage in any lawful business activities reasonably related to any of the foregoing."

40. Defendants AUM and FUNimation are purported to be vested with 65% ownership interest in BFPC, in contravention of the Original Agreement, which granted AUM only 35% interest, in order to gain majority control over the Motion Picture. The remaining 35% ownership interest was vested in SC Films International.

41. Defendants AUM and FUNimation conspired to name FUNimation as Manager in BFPC's Operating Agreement, with broad authority to expend BFPC's funds "and in such

6
FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

amounts as the Manager, in his sole discretion, shall determine is reasonably necessary to effectuate the purposes" of BFPC, is authorized to execute agreements on behalf of BFPC, is authorized to manage, control and borrow money on behalf of BFPC, is authorized to enter into agreements on behalf of BFPC with motion picture or television production companies, or, inter alia, other third parties to assist in the production of the Motion Picture.

42. Defendant Gen Fukunaga's name appears three times as signatory on the Operating Agreement: as President of FUNimation, as "Manager" of AUM, and as Manager of BFPC.

43. BFPC's Operating Agreement fails to acknowledge Plaintiff as director, writer or producer of the Motion Picture, and in fact fails to contain any mention of Plaintiff in any context.

44. Defendants failed to name Plaintiff as either a member of BFPC, or a signatory on the Operating Agreement, and accordingly Plaintiff is therefore not bound by the arbitration clause (Section 15.6) or the clause purporting to set forth the applicability of Texas law (Section 15.5).

45. BFPC was established and the Operating Agreement entered into in direct contravention of the Original Agreement, by which defendant AUM agreed to create *with Plaintiff* and SC Films International the very vehicle purported to be created by BFPC.

46. Further, BFPC was established and the Operating Agreement entered into in direct contravention of the Original Agreement, which prohibited AUM from entering into agreement which would interfere, impair or conflict with the terms and conditions of the Original Agreement, or from engaging in any unethical, deceptive, or misleading practices.

47. Plaintiff was not informed that BFPC was being established and the Operating Agreement entered into until after production had commenced, and repeatedly asked FUNimation why he had been excluded from the formation of BFPC, but was never given an explanation.

48. Instead, he was in the middle of shooting the Motion Picture on location when he was sent the agreement for directing services (hereinafter "Agreement for Directing Services") under BFPC letterhead; he requested an opportunity to have an attorney review the agreement,

given the fact that Defendants have excluded him from the formation of BFPC, but was told his signature was needed immediately or the production would stop.

49. On February 19, 2013, Plaintiff asked Defendants FUNimation, SC Films International, and AUM why he had not been included in the formation of BFPC; SC International subsequently advised that it had no objection to Plaintiff being included in BFPC.

50. Plaintiff continued his repeated questioning as to why he had not been included in BFPC, and in fact stated on March 6, 2013, that as 30% owner of the film, he could not understand why he was not given a share in BFPC with voting power. Plaintiff repeatedly asked to be included in BFPC. Defendants FUNimation and AUM continued to refuse adding Plaintiff to BFPC, and SC International pointed out on March 18, 2013 that to do so would divest Defendants of majority control of BFPC. Also on March 18, 2013, Plaintiff complained because he had not been paid fully pursuant to the agreements he had entered into when he was unaware of BFPC's creation and Operating Agreement, and objected to the validity of the assignment of his copyright and intellectual property rights which were made before he had learned he had been excluded from BFPC. Specifically, he was owed sums for directing, for the script, plus additional sums given that that the budget exceeded $500,000. Based on payments made to him to date, he is owed at least $27,000.

51. Per the Agreement for Directing Services, Plaintiff was contracted to not only direct the filming but also direct the editing in post production.

52. On or about April 8, 2013, after Plaintiff had fulfilled his duties to complete the filming of the Motion Picture, he attempted to secure the Motion Picture's hard drives to work on post production editing but Defendant FUNimation refused Plaintiff access to same. Instead, Plaintiff was informed that the hard drives would be placed in a vault pending resolution of legal issues with SC Films International.

53. On or about April 10, 2013, Plaintiff was advised that AUM's CEO Robert Rodriguez had stated AUM never intended to pay Plaintiff.

54. Numerous attempts have been made by Plaintiff and SC International to resolve the issues which have arisen due to Defendants' actions.

55. On August 2, 2013, Plaintiff was informed that FUNimation has been editing the Motion Picture without him by an editor, Julio Saldarriaga, who during the first week of April, 2013 had advised Plaintiff that according to FUNimation, the Motion Picture had been vaulted while the legal issues are being resolved.

56. Since at least February 7, 2013 the media has reported that the Motion Picture is being directed by Plaintiff, however, given Defendants' refusal to allow Plaintiff access to continue directing, Plaintiff's credit as director appears to be in jeopardy, leading to reputation damages.

57. From July 18-21, 2013, Defendants, including Giant Ape Media, advertised the Motion Picture at the widely attended San Diego Comic Con Convention. In direct contravention of the Original Agreement, the advertisements, including the large poster displayed at Defendants' booth, did not list the Motion Picture as "A Nick Lyon Film".

58. The website for the Motion Picture, www.bullet-movie.com also fails to identify the Motion Picture as "A Nick Lyon Film".

59. The trailer for the Motion Picture fails to identify the Motion Picture as "A Nick Lyon Film".

60. Posters for the Motion Picture have further failed to identify the Motion Picture as "A Nick Lyon Film".

## COUNT 1

### Copyright Infringement

### Against All Defendants

61. Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 60.

62. Plaintiff held a copyright interest in the Motion Picture until he was fraudulently misled into signing an agreement assigning his rights to same.

63. His assignment of his copyright interest is therefore void and Plaintiff retains a copyright interest in the Motion Picture.

64. Without authorization, all Defendants have and continue to utilize Plaintiff's copyrighted script and film without his permission in post production editing and marketing.

65. Defendants' actions are willful, intentional, in purposeful disregard of Plaintiff's copyright, with knowledge that his property is subject to copyright, and that their continued use of Plaintiff's copyrighted property is without authorization. As a direct and proximate cause of Defendants' infringement of Plaintiff's copyright under the Copyright Act, 17 U.S.C. section 501 et seq, Plaintiff is entitled to damages and disgorgement of Defendants' profits.

66. Monetary relief alone is not adequate to fully address the irreparable injury that Defendants' unlawful action have caused and will continue to cause Plaintiff if not enjoined.

## COUNT 2

### Breach of Contract

### Against Defendants AUM, Robert Rodriguez and Gen Fukunaga

67. Plaintiff realleges and incorporates by reference Paragraph 1 through 66.

68. Defendants have breached the Original Agreement by their failure, inter alia, to include Plaintiff in BFPC, when the Original Agreement stated that all parties to the Original Agreement would create the special vehicle entity—i.e., BFPC —to produce the Motion Picture.

69. Defendants further breached the Original Agreement, inter alia, by their failure to provide Plaintiff the tools necessary to fulfill his duties as post production director and producer; in fact, Plaintiff has been informed that Defendant FUNimation is editing without him, even though he was previously told that the editing was being placed on hold while the pending legal issues are being resolved.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

70. Defendants further breached the Original Agreement, inter alia, by failing to provide Plaintiff credit in advertising of the Motion Picture, to wit, "A Nicholas Lyon Film", including the Motion Picture's website and large poster displayed to large audiences at San Diego's Comic Con, causing reputational damages insofar as, inter alia, members of the industry had been informed that Plaintiff was making the Motion Picture and his exclusion on the advertising credits infer that he has been removed from the production

71. Defendants, by giving themselves rights under BFPC and designating themselves as majority shareholders, are uniquely situated to control the management of the Motion Picture, with the ultimate goal of incurring damages--preventing Plaintiff from receiving any net receipts, consistent with Robert Rodriguez' statement that Plaintiff will not receive any monies from the film project nor own any rights.

72. Defendants breached the Original Agreement by giving themselves an ownership interest to a combined 50% when AUM only owned a 35% interest per the terms of the Original Agreement, and which completely fails to grant Plaintiff any ownership interest when he understood that he would be receiving a 30% ownership in the Motion Picture. By the Original Agreement, all the parties—which was defined *to include Plaintiff*-- agreed to create a special purpose vehicle entity to hold and manage the rights, produce, and *own* the Motion Picture.

73. Defendants have failed to pay all that is due Plaintiff, and in fact still owed at least $27,000.

## COUNT 3

### Breach of Covenant of Good Faith and Fair Dealing

### Against Defendants AUM, Robert Rodriguez and Gen Fukunaga

74. Plaintiff realleges and incorporates by reference Paragraphs 1 through 73.

75. Plaintiff entered into the Original Agreement in good faith and in reliance on Defendants' representations that they would, inter alia, abide by all of the terms of the Original Agreement, including the promise to include Plaintiff in the creation of BFPC, avoid deceptive,

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

misleading or unethical practices, include Plaintiff to approve and exchange all relevant fully executed agreements by all parties, and exercise their rights and fulfill their obligations in a manner that would reflect favorably at all times on the good name, goodwill and reputation of all parties, including Plaintiff.

76. By entering into the Original Agreement Defendants also impliedly promised to not do anything to unfairly interfere with Plaintiff's right to receive the benefits of the Original Agreement.

77. Defendants breached this implied promise by entering into the AUM/FUNimation Agreement without Plaintiff's knowledge or consent, whereby FUNimation is purportedly to receive a 50% equity interest in the Motion Picture, without regard to Plaintiff's 30% ownership interest.

78. Defendants breached this implied promise when FUNimation created BFPC without Plaintiff's knowledge or participation, leaving FUNimation and Fukunaga with management control over the production, with the ability to replace Plaintiff as director and prevent him from completing the post production directing of the Motion Picture and to control the budget and expenses, which could adversely ultimately impair net revenues to be paid to Plaintiff.

79. Defendants breached this implied promise when they advertised the Motion Picture at the widely attended San Diego Comi Con without listing the credit: "A Nick Lyon Film", knowing that such credit was required per the Original Agreement, and knowing that the media had previously reported that Plaintiff was the director of the Motion Picture.

80. Defendants' acts unfairly interfered with Plaintiff's right to benefit from the contract, including his role as director, and potential net revenues.

81. Defendants have caused further harm by failing to give credit to Plaintiff in advertising.

///

///

12

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

## COUNT 4

### Promissory Fraud/False Promises

### Against Defendants AUM, Robert Rodriguez and Gen Fukunaga

82. Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 81.

83. Defendant AUM, including Defendants Robert Rodriguez as signatory on behalf of AUM, and Gen Fukunaga as Managing Director of AUM, made promises described herein, and as set forth in the Original Agreement.

84. These promises were important to Plaintiff agreeing to enter into the Original Agreement, and to agree to assign his copyright to the Motion Picture.

85. Defendant AUM, Rodriguez and Fukunaga did not intend to fulfil these promises, and failed to perform as indicated by the fact that just two days after the September 2, 2012 Original Agreement was executed, Defendant AUM entered into an agreement—without Plaintiff's knowledge or consent—to purportedly assign to FUNimation a 50% equity ownership.

86. Given the close relationship between FUNimation and AUM, including, inter alia, Defendant Fukunaga's role in both FUNimation and AUM, it is clear that Defendants also conspired and never intended to ensure that the promises to Plaintiff would be fulfilled, including the statement by AUM's CEO Robert Rodriguez that AUM never intended to pay Plaintiff.

87. Defendants intended that Plaintiff rely on the promises set forth in the Original Agreement, so that Plaintiff would assign his copyright to BFPC.

88. Plaintiff reasonably relied on Defendant AUM's promises as set forth in the Original Agreement and did assign his copyright to BFPC and attempted to execute his duties as director, finishing the shoot, until he was prevented from fulfilling his duty as director of post production.

89. Plaintiff also reasonably relied on Defendant AUM's promises as set forth in the Original Agreement, to shoot a successful film, including convincing colleagues in the industry

with his goodwill to keep the Motion Picture within a reasonable budget, knowing that his ultimate revenue would be positively impacted by such budget management.

## COUNT 5

### Intentional Interference with Contractual Relations

### Against All Defendants

90. Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 89.

91. Defendants Gen Fukunaga and FUNimation were aware of the Original Agreement, given that Gen Fukunaga is a Managing Partner of AUM as well as the President of FUNimation, and knowledge of the Original Agreement is imputed on FUNimation's division, Giant Ape Media, given Fukunaga's position as President of FUNimation.

92. Defendants Fukunaga, FUNimation, AUM and Rodriguez intended to disrupt the performance of the Original Agreement, as evidenced, inter alia, by its agreement with AUM just two days after AUM signed the Original Agreement, by creating BFPC without Plaintiff's knowledge or consent, misleading Plaintiff into assigning his copyright to the Motion Picture, allowing the continued editing of the Motion Picture without Plaintiff's direction.

93. Defendants Fukunaga, FUNimation, and Giant Ape Media have further intended to disrupt Plaintiff's performance as director in continuing to fail to acknowledge the Motion Picture as "A Nick Lyon Film" on all marketing.

94. The conduct by Defendants Fukunaga and FUNimation in, inter alia, entering into the AUM/FUNimation Agreement, by creating BFPC without Plaintiff's knowledge or consent, misleading Plaintiff into assigning his copyright to the Motion Picture, and allowing the continued editing of the Motion Picture without Plaintiff's participation, have prevented Plaintiff's performance or has made his performance as director and producer of the Motion Picture more expensive and difficult.

95. The conduct by Defendants Fukunaga, FUNimation and Giant Ape Media in, inter alia, failing to acknowledge the Motion Picture as "A Nick Lyon Film" has made his performance as director and producer more difficult.

96. Plaintiff's reputation has been and will continue to be damaged, his right to future net receipts and his ownership interest in the Motion Picture have been harmed due to the wrongful, intentional and continuing conduct by all Defendants.

## COUNT 6

### California Unfair Competition and Unfair Business Practices

### under Bus. & Prof. Code section 17200 et seq.

### Against all Defendants

97. Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 96.

98. Defendants' business practices as alleged infra constitute unfair business practices and/or unfair competition in violation of California Business and Professions Code section 17200 et seq.

99. Plaintiff is and will continue to be damaged by Defendants' wrongful actions.

100. Plaintiff has suffered and continues to suffer injury for which no adequate remedy exists at law.

101. Without injunctive relief, Plaintiff has no means by which to control Defendants' unlawful conduct as set forth in Paragraphs 1 through 96.

102. Plaintiff is entitled to injunctive relief prohibiting Defendants from violating California Business and Professional Code section 17200 et seq.

///

///

///

///

# COUNT 7

## Common Law Unfair Competition

### Against all Defendants

103. Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 102.

104. Defendants' business practices as alleged infra constitute unfair business practices and/or unfair competition under common law.

105. Plaintiff is and will continue to be damaged by Defendants' wrongful actions.

106. Plaintiff has suffered and continues to suffer injury for which no adequate remedy exists at law.

107. Without injunctive relief, Plaintiff has no means by which to control Defendants' unlawful conduct as set forth in Paragraphs 1 through 96.

108. Plaintiff is entitled to injunctive relief prohibiting Defendants from further injury and damages under the common law unfair competition law.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for judgment as follows:

a. Actual damages.
b. Special damages.
c. Interest.
d. Punitive damages.
e. Attorney's fees.
f. Costs of suit.
g. Injunctive relief to include: return of the hard drives, prohibition against further editing without Plaintiff's direction, return of the hard drives to Plaintiff so he can complete editing for release of the Motion Picture, prohibition of sale, distribution or marketing of the Motion Picture without consent by Plaintiff.

h. Void all contracts, including the AUM/FUNimation Agreement, and the Operating Agreement, which were entered into without Plaintiff's knowledge or consent.

i. Void all contracts which Plaintiff was fraudulently led to enter into, including the assignment of his copyright.

j. Dissolution of BFPC, which was entered into without Plaintiff's knowledge, consent or participation.

k. Such further legal and equitable relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff further demands a jury trial in the above entitled action.

Dated: September 9, 2013

KINAGA LAW FIRM

By: *Patricia Kinaga*

PATRICIA A. KINAGA
Attorneys for Plaintiff
NICHOLAS LYON